case number 24-100. The briefing in this case covers many issues, and of course I'm prepared to address any questions the court may have about any of them. I would propose to focus this morning on the Predetermination and Religious Freedom Claims and to start with the Predetermination Claim. Our fundamental disagreement on the Predetermination Claim concerns the defendant's contention that it does not matter whether Calderon and Jones predetermined the result of Mr. Baltas' C.D. placement hearing because, according to them, the ultimate C.D. placement decision was made by Maiba following an independent review. And I think there are two basic reasons why that position is mistaken. The first is derived from Proctor v. Leclerc, and the second flows from Cowell v. Coughlin. And I propose to walk through both of those, starting with Proctor. In Proctor, it may challenge the procedures through which he had been maintained for many years in administrative segregation. He argued that members of the Facility Committee, which conducted the initial review of his continued placement, had predetermined the result of his hearings and that the proceedings were a sham. The Court reversed summary judgment against that claim, and it held that such predetermined proceedings violated the right to meaningful review under the due process clause. It did so even though the Facility Committee was not a final decision maker. It could only make recommendations subject to review by another committee and then ultimately a decision by the Department of Corrections Deputy Commissioner. To support that conclusion, and this is a footnote aid of the opinion, the Court emphasized based on testimony from the officials involved that the Committee's decision had received substantial weight. I think that same logic applies here, although for slightly different factual reasons. Here, as in Proctor, the initial reviewer, Calverton, predetermines the evidentiary hearing and his associated recommendation, or at least that's the right conclusion on the summary judgment standard of review. That recommendation, in turn, went to another official for final decision, just like in  Proctor. And here, as well, there is strong reason to believe that that final decision by Maiga was not independent, but was entirely or substantially derivative of or dependent upon the initial one-lawful hearing. And that's the case for a couple reasons. First, while testifying about the independent review that he had conducted, and this is the appendix of 161, Maiga stated that he approved the placement based on the recommendation and documentation provided by GCI staff, a.k.a. Calderon, as well as his staff's review of the records. So he based his decision on Calderon's recommendation and report, and his staff's review of the  And what records exactly— And is it enough—is that first part enough, in your view, to say that Calderon's statement shows and is sufficient to show the predetermination? It is, for what I would describe as the second reason that I would turn to, which is the Powell theory, which is a kind of structural error theory. It's on Proctor. Yeah, but on the Proctor theory, I actually think we need another step, but we can take that step. On the Proctor theory, it's not just that he relied on Calderon's report and recommendation. It's that he also relied on his staff's review. But the only thing his staff reviewed was the report and recommendation from Calderon. So it turns out that it's Calderon all the way down. So it's an extra smaller step. Exactly. That all that they reviewed is Calderon's. It's Calderon all the way down. And consistent with that reality, Maiga and his staff spent less than three hours on this entire issue and offered only the most cursory explanation for their decision. Quote, C.D. placement authorized meets criteria for placement. Under these circumstances, and following a direct application of Proctor, this court can and should conclude that Maiga really did—Maiga and his staff just looked at what Calderon gave them and rubber-stamped it, which is exactly the kind of rationale that the court relied on in Proctor. But there's a different way to the same conclusion, and it comes from the court's decision in  It's an independent basis. And it draws in Proctor based on one of their own decisions, the Donziger case from 2018. In Powell, this court noted that a biased adjudicator is, in general, a structural defect. That instinct is well-placed, and I take it you control the outcome here independent of Proctor. Judge Harris, as you observed in the Donziger opinion—and that's 833 F. 3rd 74, this was 2018—the Supreme Court has repeatedly held that the unfairness resulting from an unconstitutionally biased conditional adjudicator cannot be solved by offering an impartial adjudication on appeal. The Supreme Court has said that in Ward v. Monroeville and Concrete-products of California. In other words, a biased adjudicator is treated as a structural error, which this court said in Powell, and then later said again in Gibbons v. Savage. Was that objection—was that critique of the process presented on the administrative appeal? On the administrative appeal? Yes. Oh, you mean—so has this been properly exhausted? That's my question. Yes. The answer to that question is it was presented enough. I'm looking at 258 of the appendix, and your client says, I did not receive due process. I was due. I received notification late, and then he adds, A, I didn't receive advisory services, and B, the hearing was conducted without my having the advisory services. And he says, these violations denied me due process. So it looks like that was his due process complaint. If he had presented the appellate administrative authority with a claim of a biased adjudicator, they could have appointed a non-biased adjudicator, and then we wouldn't have a problem. Correct? Incorrect, I think, for two reasons. The first is that I disagree with the premise, which is that we don't satisfy the standard. The second is you could think there's a futility issue here, given how they, in fact, responded to all the other complaints you raised, which was to just dismiss them out of hand. They could have redone the notice, redone the hearing. They could have done all of that for any of these complaints. If you don't complain about something, you're not going to get any relief. Now, I hear you that these proceedings tend to be economically conducted, and he might not have gotten any relief anyway, but he is required to have exhausted. I don't read the exhaustion here. Sure. You know, I think, look, when it comes to exhaustion, of course, this is an affirmative defense. The burden is on the defendants to establish it. The issue was expressly raised in the district court, and the district court did not treat it as an exhaustion issue, and you can see docket 70 cents below, pages 12 to 14. If you look at A258, which is the grievance that you're referring to, what this course has said in Edwards v. Arovo, which is a decision from last year, is the grievance need only alert the prison to the nature of the wrong for which we tried to solve. It doesn't have to lay out legal facts, particularly legal theories for demand particulars. Absolutely. And Judge Karras has highlighted that it's actually enough if the claim is closely related to but not explicitly mentioned in an exhaustive grievance. We cite that case in our five-record page three. Well, that's because no displeading requires you to think about what people are alleging, but here it looks like the claim was limited to the unavailability of the assistant. I think it goes a bit beyond that, and what I would highlight, I think there's two pieces of language that would support our position. The first of these is that it's the general point that he didn't get the notice he was due in connection with the hearing. And if you go beyond that and say he needs to start specifying a subsidiary in process hearings. If it's a disciplinary hearing, then he didn't get it because he needed 24 hours and he only got 20. But if it's an administrative proceeding, well, 20 hours would be enough. I mean, just gently resist that, you know, on two grounds. The first is— Gently, gently. Gently. I promise I'm not going to be too aggressive about this, but if you look at page 259, the other thing he highlights in his grievance is he says— Which subparagraph? I'm focused here on subparagraphs. Sorry, his handwriting is not the model. Yeah, that is— Subparagraph. It's Marjorie's handwriting. Here is his paragraph. He says, you know, the disciplinary reports that were the basis of this hearing were the result of staff harassment and improprieties. They were—the officers were intending to orchestrate these incidents weeks in advance of requesting, essentially, that he be moved or transferred. I think you can fairly leave that language in coordination with his claim that due process generally was not followed and that— And said the whole thing was fixed. And said the whole thing was fixed. That phrase orchestrate, you know, I mean, in my mind, I have, you know, thesaurus.com here, but, you know, orchestrate sort of connotes this idea of predetermination, preordainment. That might be one reason why the court directed me to brief this issue. I think, you know, I think that language, keeping in mind that he doesn't need to plead a legal theory. He said there was a due process problem at the hearing where the decision was made to put me in an administrative-segregated and restricted housing unit and that this was all orchestrated a week in advance because these people were out to get me. I think that would be sufficient under this court's precedence to exhaust. That focuses on what happened before the hearing. What about that suggests that the hearing officer was biased? I think the—I think the way that you tie those two things together, there are two ways to tie them together. One is to just say on the face of the grievance, keeping in mind the relatively low bar for exhaustion in a context like this, him saying they were conspiring for weeks to get me. But they was—they is the corrections officers. They being the corrections officers were conspiring for weeks to get me. And him saying, and they didn't follow due process at the hearing where they finally did get me, is enough to put them on notice that he thinks the thing was a set-up and that his rights were not respected there. At least that's a reasonable enough inference. You know, to borrow Judge Karras' language, it's sort of closely related to the theory that he was identifying in these circumstances. And he does use the word due process. And the court does not generally require a precise specification of kind of sub-legal theories beyond saying my due process rights were violated at the hearing. That resulted, in this case, from what you call the kind of orchestrated campaign. It would make it pretty difficult to draw a line between this case and a lot of others where there's a reference due process to say that, no, he didn't claim that the hearing officer was biased. I appreciate that. And I think you don't need to rely on the reference due process alone. And I appreciate that there is a floodgates concern there. I think the language that you would— The orchestrate language. It's the orchestrate language. It's an unusual term of art, right? And saying these defending prison officials had orchestrated for weeks a campaign of false reports and harassment whose purpose, if he specifies, repeatedly requesting separation or transfers, right? This is about getting him out of the general population unit and keeping him stuck in RGU. That's what he's latching onto there. He understands that there's a bunch of people who, for weeks, have been working to bring that effect about. I think that fairly encompasses the idea that at the hearing where those very things were relied upon to accomplish that, that was where the orchestration kind of reached its intended effect. And you point out, I think, although I haven't focused on this, that the district court itself did not—didn't really grapple with this issue. Is that correct? That is correct. Even though he did raise it in his papers, at least enough—I mean, I refer to, again, Docket 76's motion for summary judgment on position of 12 to 14. The premise of the orchestration is that the underlying disciplinary reports were phony. I think the premise of the orchestration is that the disciplinary reports were phony, and many of them had, in fact, been dismissed. Yeah, I know, but at least five of them had not been. Five of them had not been quite correct. And that's more than, what, the three that are necessary? Well, three are only necessary to trigger automatic consideration for— To trigger automatic— Consideration. Consideration. And so three were enough to put him in a position where they would consider whether to do it. But I think what he's saying is they weren't falsifying these reports just for him. They weren't doing it just for the sake of it. They were doing it to put him in restricted housing, which is to say they were doing it for the purpose of setting up precisely this orchestrated hearing. Well, if people—if inmates commit misconduct, then they do prepare reports for the purpose of isolating someone or putting them in a place where they won't be in a position to cause trouble. Isn't that right? That doesn't sound like a—it's not a conspiracy. It's administration. Well, respectfully, I can disentangle two issues. One question is exhaustion, which is the question that I took Your Honor to start with. Yes. The question there is whether in the prison administrative process he properly reused a theory that was sufficient to put some notice into place that he thought that one of the problems in the hearing was that it was a setup. That's the exhaustion question. The second question, which I take Your Honor to be alluding to, is whether, you know, at the hearing, you know, there was a proper basis to, in fact, put him on restricted steps. But with respect to that—and I'll get to that question. No, I understand that he's entitled—he's entitled to an unbiased hearing. Exactly. On that issue. There's no question about that. Exactly. The question is, though, I mean, what—I'm not sure I see much notice here because even though he says as many inmates say that they, you know, there's an orchestrated conspiracy against Mita, when he gets to due process, he specifies what he's talking about. And it doesn't really include having a biased adjudicator by any terms that might be used. Let me resist that a bit less generally. Go ahead. I don't think that's the correct reading of the notice, right? He doesn't get to due process in the sense that there's a section and then a subsidiary due process point. The first thing he says in his notice is, I did not receive the process I was due. In some respect, every other part of this notice is a specification of that first sentence. He says, I did not get the process that I was due. And one of the things he says is that there were problems with the notice and the adviser at the hearing. And then a thing that he later says is all of these disciplinary reports were part of an orchestrated effort to sort of essentially— But immediately after that he said these violations denied to me due process, and those violations did not include having a biased adjudicator. They're substantial. I mean, they're legitimate questions, but it doesn't include having a biased adjudicator. That's fair. In some ways the question then is whether—my understanding of this Court's precedent, and, of course, I defer to the Court's understanding of precedent, is that there is not a magic word requirement. The question is could someone read this and understand him to be saying something went terribly wrong at my hearing, and one of the things that went wrong is that there was a weeks-long orchestrated effort to set me up so that I would end up on restricted housing, which is the thing that happened at the hearing. And I think it is perfectly consistent with precedent. So maybe you've answered this question about how to assess when you've got a prisoner who is obviously pro se, how to assess the wording. And once we get into parsing words, is that an exercise that we have engaged in in prior decisions? It's not, and the Court has, in fact, expressly said it's what you don't do. You're trying to understand with the gist of this on some level. Indulging the allowances that we made for an uncounseled pro se, fairly unsophisticated inmate here, he's saying I had a hearing. There was a due process at the hearing. The hearing was the result of a weeks-long orchestrated effort to use false disciplinary reports to keep me stuck in restricted housing. Could that give them notice that he thought the hearing was a setup? For what it's worth, I think that's a reasonable enough inference to say that at least at the summary judgment stage, they have not carried their burden of making up an affirmative defense of failure due process. So, Mr. Matz, you said that you had – you answered, really, addressed two things, predetermination, the proctor and Powell. What's the second thing? The second thing was the religious freedom claim. Can I buy, say, 30 seconds on the predetermination point? You can buy a minute. On the predetermination point, the thing I would quickly note, the proctor theory is essentially that Calderon was really the decision-maker in the way that the recommender there was. The Powell theory is that you should think of the error here as structural, where it doesn't matter if there was independent review. Because even if it was truly, purely independent, structural error at the moment where the hearing occurs is something that, in the law, we generally don't say. You can sort of unscramble the egg for some subsequent appellate process. That was just a distinct way to have a – how you might reason through that situation. On the religious freedom point – on the religious freedom point – and, again, there's more issues here, but these are the two that I wanted to highlight. I myself would focus – I'm focused on the legitimate penological interest. Okay. That's all. And so I think there's a bit of a shift passing in the ninth dynamic to the way that the parties have briefed the religious freedom issue. What we have briefed is a claim that there is a practice – not a policy, but a practice at Garner, where there was in this period of time, of refusing to permit prisoners housed at the RHU to perform traditional smudging outside the facility pursuant to the otherwise applicable smudging policy of the facility. The evidence of that practice is to be found in the Hurdle Declaration at day 200 and in the AFI affidavit at day 221. It was pursuant to that general practice that our client was not allowed to smudge, and we explain in our brief why that practice on its face is unconstitutional and whether it isn't qualified of duty. The defendants respond to that by ignoring that practice, which was in fact the stated reason for why he was not allowed to smudge. And they say, well, anyway, as to him, we would have had a good reason not to let him do it, right, which was not the basis of the decision and not supported by the record. And there's a lot of sort of post-hoc rationale in counsel about why they think there could have been a good explanation for why our client should not have been allowed to smudge. Now, there's two separate folks. So you're saying that the initial argument was based on the practice? Yes. Okay. Yes. So if you look at the explanations in the record for what happened here, what they say is, look, we just don't allow people in the R.H.U. to engage in smudging. As it turns out, people in the R.H.U. may not all be there as a matter of finding that they present a safety threat. They might be there for their own protection or to pretrial contacts or for many other reasons. And what they say is we just don't let people at that time in the R.H.U. do this, and I give you the sites that support that. There's a lot of law that says you can't have a policy like that, and that's the policy we adopt. They respond to that and say, well, essentially, no harm, no foul, because we're not going to defend that policy. But even as to him specifically, there would have been good reasons not to let him do that. And there are two problems with that. The first is that's not how this works. Right? If the reason why they did it was pursuant to that general rule, they can't sort of, after the fact, on appeal make up more reasons why it would have been fine for him. The second is the reasons that they do make up as to why it would have been fine for him aren't very good reasons. And that's true, and to me this is not necessary for the court to reach, but it's true most fundamentally because the disciplinary offenses that he was in there for involved tinkering with his door, being cantankerous to a locksmith, apparently masturbating several times. There was absolutely no indication that across the many, many disciplinary reports, both upheld and not upheld, that there had ever been any issue with him when it came to smudging, when it came to fire, when it came to his conduct in connection with performing his sincerely held religious beliefs. They didn't apparently make a feather available to him for the alternative that he explained that length would not have been satisfactory in his own conception of religious order. So they did not make available what they argue is the sufficient alternative? That's right. And they try to blame him and say, well, he didn't ask. Of course, you could think, well, he says, you know, there might be a genuine dispute about that, or you might think he didn't ask because what he asked for was to do the thing his religion required him to do, and it wasn't on him to propose religiously unsatisfactory alternatives, which seems to be the way that they're thinking about it. So, Mr. Matz, I've kept you well past your time, but you do have some time for rebuttal. Thank you, Your Honor. And we'll hear from your friend, Mr. Ulrich. May it please the Court that I will work on behalf of the defendants. This court should affirm the district court's judgment. There is no material dispute of fact as to any of the plaintiff's claims, and I would welcome the court's questions as to any of those claims, but I would similarly like to focus on the predetermination issue and the free exercise issue. This court need not consider and should not consider the predetermination claim on its merits because the plaintiff failed to exhaust this issue for all the reasons that have already been discussed. And I want to start by explaining the standard as to sort of what level of specificity is required in these grievances. The general standard under this court's precedent is that the alleged misconduct may not be so vague as to preclude or to prevent prison officials from taking steps to investigate and rectify the misconduct internally. Here, plaintiff's grievance was too vague in that respect. So what would prevent a prison official faced with what appears as 259, the word orchestrate, which I also focused on, from just following up and asking, when you say orchestrate, what do you mean? Just because what you're saying is, does it trigger some questions, some investigation? When you say orchestrate, what do you mean? And that would presumably or might have elicited information about this predetermination claim. Well, that language on 259, as has already been pointed out, was about these incidents referring to the allegedly false disciplinary reports that have been issued against them. And if anything, it would have prompted prison officials to go to the various either correctional officers who had filed those disciplinary reports to investigate whether or not they were in fact falsely making those reports or the hearing officers who had reviewed the disciplinary reports that were dismissed. And if anything, the fact that so many of the disciplinary reports were dismissed for various reasons, for procedural imperfections or lack of evidence, demonstrates that the process was working internally in terms of sorting out the unsubstantiated reports from those that were substantiated. And what the grievance, the language of the grievance that relates to the plaintiff's explicit due process argument was only two alleged defects, the lack of an advisor and the lack of enough time to prepare enough notice. And so in that respect, all that a prison official reviewing this grievance would have thought to ask about is to go to Calderon and say, and ask, was he provided with an advisor? If so, why not? Why did the hearing take place at this time and why not? Was he provided with adequate notice? Yes, Your Honor, he was here because, as we detail in the brief, all that was required as a Hewitt standard which requires some notice and the 20 hours was enough that was provided. But in terms of the exhaustion, the second point I wanted to make in terms of the level of specificity that's required, this court explained in Espinal v. Gore that the level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim because it's the prison's requirements, not the PLRA, that defines the boundaries of proper exhaustion. So here, we look to what the instructions were, and if you look at the form itself, the CN-9602 form, that is the grievance form. Where is that? It's A257. Oh, 257, it's just the first page, okay. Yes, it directs the inmate to provide any factual information that is applicable. So we agree that it's a notice-bleeding standard, but there needs to be some factual basis to support the subsequent predetermination claim. We're not saying that he had to articulate a specific legal theory. We're not saying he even had to name these defendants. But if he had to include some factual information by just generally saying the outcome of this hearing was What are we to make of the fact that the district court did not seem troubled by this issue and it was not the subject of any real discussion? I don't think this court need to put much weight on that at all. The exhaustion requirement is not directed. You made the argument? Yes, absolutely. This is our primary argument in response to the predetermination claim. We made the argument below, and in a footnote, the court just says I'm declining to address it. If there is a biased adjudicator, what can an agency or an institution do about it? How can you rectify that? Presumably the way to rectify it would be to go to Calderon, investigate, find out if there's any factual basis for this, and if so, provide a new hearing would be the way that the prison officials would rectify it. And what do you say, just as a follow-up to that, about the fact that Mr. Maiga relied on Calderon's statement, but then the second part of that, as Mr. Matz pointed out, is that the staff, on which he also relied, relied only on what Mr. Calderon said. What is your response to that? Thank you. I wanted to address that as well. And this case is different from Procter in this respect. In Procter, there was evidence, extensive evidence, that the higher-ranking officials testified that they gave significant weight to the lower-ranking officials' recommendations. And, in fact, there was evidence that they had virtually never disagreed or departed with that recommendation. So it was far more fleshed out in Procter than the evidence. The higher-ranking officials, this was their practice in that they were essentially rubber stamping the lower-ranking officials' recommendations. We don't have that here. What we have is Maiga's declaration explaining that they received both Calderon's recommendations and supporting documents. We don't know what those supporting documents are. But, at minimum, we know that Maiga and his staff had the recommendation in the report, which includes the evidentiary foundation for the CD placement, the five disciplinary infractions, the dates on which they occurred, the type of infractions, as well as Plaintiff's statement, which there's no longer a dispute that he was provided an opportunity to give this statement. So they had the opportunity, which was recorded in Calderon's report. They had the opportunity to review that. And there's also, unlike in sort of the one or main case in which a claim like this was allowed to proceed in the Seventh Circuit, the Prude v. Melle case, there's no evidence connecting Calderon to Maiga other than this report. So there's no evidence that Maiga or his staff were even aware that the lower ranking officials like Jones and Calderon allegedly had created this conspiracy to break this outcome. So they independently— Well, hold on. If the record were the following, then maybe you'd have a different response. So if the record hypothetically were that Calderon clearly had predetermined the result and Maiga, on review, said, I'm relying entirely on the fact that it's Calderon who's made this decision, that would be enough. I think that would be a far—yes, I think that would be a far closer case. And why is that? Why is that? Yeah, why is that a much closer case? Well, because that's a lot more like Procter, which this Court said that additional— So here, let me go back to my initial question, which is that, as I understand it, Maiga cites to Calderon's decision, and then he cites to the staff review, which is, again, goes back to Calderon's decision. Am I wrong about that? I think that it's important to understand that Calderon's decision was comprised of three pages. So the first page outlines the disciplinary interactions, and then it recites the plaintiff's statement. And then at the end, there's a recommendation. There's one sentence that says, meets criteria. So they had the information about why Calderon was recommending chronic discipline, and there is no disclaim here that there was no evidentiary support whatsoever for the C.D. placement, or that the placement was arbitrary or abuse of discretion. He had five disciplinary interactions. He was a serial offender. He had 60 total at that point. So there was ample evidence in support of this. And there was no evidence that Maiga and his staff were even aware of these allegations that Calderon had unfairly or prejudged the evidence or was biased against the plaintiff. I do want to turn to the pre-exercise. I'm happy to answer any questions the Court has about the predetermination issue, but I see my time is dwindling, and I do want to take a moment to address the pre-exercise issue. And I want to make a point before the legitimate penological interest point about the fact that this Court need not reach the merits again because of there's a lack of personal involvement here. The only remaining defendant is Deputy Warden Jones. And no reasonable juror could find that she was personally involved in this alleged denial of the opportunity to smudge because the evidence shows she did not create this practice or she was not responsible for this practice. She did not enforce this policy or practice as to the plaintiff, and she was not responsible for administering the smudging program. What about Maiga and Rinaldi? Maiga and Rinaldi, as I understand it, I believe this claim was originally only as to Jones and Rinaldi, and at least in the reply brief, the plaintiff's reply brief, the only dispute appears to remain as to Jones. So there's a dispute as to whether or not the plaintiff complained to Jones about this. He says, I complained to her about this, and Jones says she didn't. What there's no dispute over, however, is that even if these complaints had happened and Jones had received these, she would have referred them to subordinate officials, and most likely the subordinate officials that the plaintiff had already spoken to about this. who was responsible for the day-to-day operations of the RHU, Chaplain A.V., and therefore under those circumstances where a discourse precedent is clear that in cases where all a supervisor official has done is received a complaint and forwarded it to a subordinate, but that's not enough for personal involvement. Does the record show whether she subordinated? She forwarded it to a subordinate? No, the record shows, no, because she claims she did not receive it, but the record does support that. She says, had I received it, I would have. That's what she does. Yes. And the last point I wanted to make about the three other cases. Maybe I'm missing something. I thought that there was a, so her, the claim as to her was dismissed for lack of personal involvement, or was it dismissed on qualified immunity grounds? The court concluded that the defendants were not personally involved as to any denial of dry smudging, but the court's personal involvement analysis was limited to that. We argued below the defendants were not personally involved in any respect, and this court should, the record supports that, so this court should likewise reach that conclusion. The last point I wanted to make is that there was nothing post hoc about the defendants' justifications here. Captain Hurdle's declaration, which again is on page 200 of the appendix, is focused on inmates who are dangerous. So in explaining why smudging is not allowed generally in the restricted housing, he says that the population in restricted housing have for the most part been deemed to present various safety and security concerns while housed among the general population and therefore require careful management and oversight. This included the plaintiff. So he acknowledges that not every single inmate in the RHU is a dangerous inmate, but here he identifies the plaintiff specifically as an inmate who presents safety and concerns, security concerns, and that's consistent with the plaintiff's placement on chronic discipline, which is the requirement for chronic discipline. So was he not able to smudge while in the RHU later on in December 2021? That's his claim. He claims that he was able to. But that's part of the summary judgment record. Doesn't that undermine this claim that he represents a threat or that allowing him to do that represents a threat? I believe that's a disputed fact. So if you believe that, then as to this issue of whether the practice was legal or illegal and whether there was a legitimate penological interest in preventing him from, because of his background, because of his past disciplinary record, in preventing him from smudging, why isn't that a disputed fact that ought to be tried? I'm trying to recall, Your Honor, specifically where in the record the defendants responded to that allegation. It's not coming to mind at the moment. So just to be clear, I'm aware of the significant disciplinary record, but what we've got in front of us is a summary judgment record. And I hear you very forthrightly say that there is a disputed fact as to this practice. He says X, and I think it's not rebutted, but even if it is rebutted, that is a disputed fact. What are we to do? What are we to draw from that? I think that the best response I can give, Your Honor, is that the claim here is that he was denied the opportunity to smudge during the time he was housed in the restricted housing unit on chronic discipline between March of 2018 to his transfer out in June. But the response is that he, by virtue of his background and by virtue of his past chronic disciplinary issues, he represented a – well, allowing him to smudge, to light something, represented a real risk to the facility, correct? Yes, during that time. So it doesn't get better. That's my question. So when he says, well, I was able to smudge thereafter, that at least puts into question the legitimacy of the response that you point to at 200, for example. I don't think that period is relevant to what his claim is in a 1983 complaint, which is that I was denied during this two-and-a-half-month period in 2018. And during that time, what the record shows is that the defendants consistently took the position that he was a dangerous individual, that this was a safety risk. Thank you very much. If there are no further questions, we would urge the Court to approve. Thank you very much, Your Honor. Thank you. Thank you. May it please the Court, I'd like to make two points on the religious freedom issue and two points on the predetermination issue. On the religious freedom issue, let me start with a personal involvement point. I think the position is directly foreclosed by Judge Gerst's, your opinion with Judge Menasche in the Wiggins v. Griffin case, which was decided in 2023. Of course, Judge Menasche, who joined that case with you, had actually also written the Tim Cuddy case. Right there, what the Court said is that where a prison official had a supervisory role over religious chaplains, actual and constructive notice of the denial of a right to attend services and failed to take action in response. They were personally liable. Here, a reasonable juror could find that Jones was involved in placing Baltus in restricted housing, oversaw the religious services department at Garner, that's A165, that Baltus repeatedly complained to her in person and in writing about the fact that he couldn't smudge, which meant she had actual and constructive notice, that's A386, and that she failed to take any action in response to those complaints, that's A386 as well. I thought the idea is she did, that if she had received it, she would have sent it to the chaplain or to some other subordinate with responsibility for taking care of the matter. So would she – there's a genuine dispute of fact on this point. My client says I told her, I told her in person, I told her in writing, she oversaw this department, she did not. What she says is I didn't know about any of this, and if I did know, all I would have done is asked someone else to do something about it. Well, I mean, she's the senior executive, and she doesn't do everything. Well, that's – but that's also what you see in Wiggins, where you have a supervisory – I mean, the definition – the reason we're in San Credit territory is we're talking about a supervisor, and what Wiggins says is that when someone who has that authority knows and doesn't act, that they – that you can support a claim against that person. I do think the Wiggins case is just unauthorized. That's in the context of qualified immunity. There was a qualified immunity issue in the Wiggins case, but there was a personal – there was a supervisory liability issue there. And even if you don't – and even if you don't focus on the supervisory liability issue specifically, that fact pattern of supporting supervisory liability is, I think, directly applicable. The other point that was made is that if you look at the Hurdle Declaration, and this is page A200 of the appendix, paragraph 35, it would support the idea that there was a particular reason why the plaintiff was denied the ability to smudge. It actually says the opposite of that. What the paragraph says is the population in the RHU have, for the most part, been deemed to present various safety and security risks when housed among the general population. This included the plaintiff, and then it goes on to housed in chronic discipline status at the time, and then it says providing an inmate in restrictive housing access to a letter would have undermined the safety and security of the unit. It just restates the point that I was making. The practice. So that's on the women's group issue. On the predetermination point, I think we've ventilated the exhaustion point. We made the point about orchestration. So let me focus on just the factual issue that arose, which is that my friend says this case is not like Proctor for two reasons. He says it's not like Proctor, first, because there you had testimony from the sort of supervising official that they, in fact, really relied on what came below, and here you don't have that testimony. And that's true. Instead, what you have is an affidavit in which he says I and my staff relied on X, and X just is the report from Calgary that came from that hearing. The other thing that my friend says is, well, it's actually not that big a deal because there was a statement from Baltus that was included. He says it is undisputed that Baltus' statement to Calderon made its way into MIEGA. The problem is that it is disputed, and this is at Record 8383, in which my client says that Calderon, as you would think of someone who is a biased adjudicator, had grossly misrepresented what he was saying and trying to do at the hearing. So all that makes its way to MIEGA is the product of this broken hearing, which under Proctor supports reversal, and independently on a theory of structural error, also independently supports reversal. Thank you. Thank you very much. We'll reserve the decision.